IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

ARTHUR JOYAL BARKER #1290750     §

VS.     §     CIVIL ACTION NO. 9:12CV10

RUTH BROUWER, ET AL.     §

MEMORANDUM OPINION AND ORDER

Plaintiff Arthur Joyal Barker, an inmate confined in the Eastham Unit of the Texas prison system, proceeding *pro se* and *in forma pauperis*, filed the above-styled and numbered civil rights lawsuit under 42 U.S.C. § 1983. The complaint was transferred to the undersigned with the consent of the parties pursuant to 28 U.S.C. § 636(c).

## I.　　BACKGROUND

The original complaint was filed on January 1, 2012.[1] On May 17, 2012, the Court conducted an evidentiary hearing, in accordance with *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), to consider the Plaintiff's claims. The hearing was conducted "to dig beneath the conclusional allegations; to reduce the level of abstraction upon which the claims rest; to ascertain exactly what scenario the prisoner claims occurred, as well as the legal basis for the claim." *Id.* at 180. The

---

[1] In the complaint, Plaintiff repeats his narrative statement of facts twice. *See* Complaint at PageID #4-6, 15-21. The second iteration appears to be in the form of a handwritten complaint that Plaintiff then attached to the form-based complaint containing his first iteration. They are consistent with each other, but the second iteration is somewhat more descriptive and the Court will generally cite to that narrative. The PageID # is assigned electronically to each document filed in the CM/ECF electronic filing system, beginning with the first page of the first document on the docket and continuing sequentially throughout the docket.

1

hearing is "in the nature of a motion for more definite statement." *Id.* at 180-181. The Plaintiff testified as to the factual basis of his claims. Texas Department of Criminal Justice ("TDCJ") Regional Grievance Office representative Lorie Parker, Nurse Kelly Maxwell and Warden William Motal testified under oath about prison policies and information contained in the Plaintiff's prison records.

Plaintiff alleges that in July 2011, he filed a number of I-60 sick call requests while incarcerated at the TDCJ Eastham Unit on the issue of renewal and reorder of certain medications.[2] Complaint at PageID #15. His series of I-60s led to a "lay-in" or appointment to the Unit medical department on August 1, 2011, where he met with Defendant Ruth Brouwer[3] "on the issues of the reorder." *Id.* He alleges that Defendant Brouwer told him that the I-60 that requested the lay-in did not mention Simethicone, one of the antacid medications he wanted renewed, and that she would not reorder it. *Id.* She then escorted him to the nurse's desk. *Id.* At that time, he alleges that she asked if there was anything else, and he told her that he was having severe chest pains on the left side of his chest and "could not hardly breath[e]," after which he further alleges Defendant Brouwer stated he did not raise a "life-threat[en]ing or emergency situation" on the I-60 and told him to resubmit another I-60 for that complaint. *Id.* That ended the lay-in.

Plaintiff alleges that on August 1, 2011, he placed another I-60 into the Unit medical box addressed to Defendant Brouwer and Dr. Smith "on the issues of Plaintiff's Barkers and Defendant Ruth Brouwer's conversation on August 1, 2011, which Defendant Ruth Brouwer had denied

---

[2]     These medications included types of antacids, Ibuprofen, Benadryl and creams.

[3]     Plaintiff refers to Defendant Brouwer as a nurse in his Complaint; she is instead a physician's assistant.

Plaintiff Barker medical treatment for Plaintiff's life threat[en]ing situation." *Id*. at PageID #15-16.

Plaintiff further alleges that on August 6, 2011, he was called out to the medical department by Defendant Nurse Joyce Francis[4] on the issues Plaintiff had raised in his I-60s. *Id*. at PageID #16. He claims that she called him a liar regarding Defendant Brouwer's alleged "denial of medical treatment for a life threat[en]ing situation," stating that there was nothing wrong with Plaintiff. *Id*. He next alleges that Defendant Francis hooked up the leads to take an electrocardiogram ("EKG") incorrectly and that the left side lead kept coming off and she kept putting it back on to "keep getting an incomplet[e] misreading." *Id*. He was then told to return to his housing area. *Id*.

Next, Plaintiff alleges that on August 7, 2011, he went to the medical department complaining of chest pains and shortness of breath and was seen by Defendant Nurse Maciel. *Id*. at PageID #16-17. He alleges he explained his complaint to Defendant Maciel, who then "diagnosed" Plaintiff with "having done to[o] much exer[cise]." *Id*. at PageID #17. Plaintiff alleges Defendant Maciel would not "take what Plaintiff Barker was saying [as] true," but prescribed 600 mg Ipubrofen tablets and sent him back to his housing area without taking any vitals, such as blood pressure, temperature or an EKG. *Id*. That afternoon, still August 7, 2011, Plaintiff alleges he was having problems breathing, was throwing up and has nausea and dizziness. *Id*. Sergeant Anderson helped him to the stairway and down the stairs to a wheelchair and he was taken back to medical and again seen by Defendant Maciel. *Id*. at PageID #17-18. He alleges that Defendant Nurse Maciel "prescribed" a liter of intravenous lactated ringer's solution, which Plaintiff contends "enhanced" his pain, and also "prescribed" bismuth-salicylate (pepto-bismol). *Id*. at PageID #18. He also alleges

---

[4]    In the complaint and elsewhere, Plaintiff spells this defendant's last name as both "Frances" and "Francis." Defendants refer to her as "Francis" in their summary judgment papers and the Court will adhere to that spelling.

that Defendant Maciel told Plaintiff that if he wanted, he could return the next day. *Id.*

On August 8, 2011, in the morning, Plaintiff alleges that officers on the run found that he did not look good. *Id.* About 12:30 p.m., Plaintiff tried to go downstairs to go to medical, but Officer Mack ordered him to sit and called for a wheelchair. *Id.* He alleges an EKG was taken when he arrived at medical and he was then sent on an emergency basis to the East Texas Medical Center - Trinity, where he was further evaluated by EKG and blood work. *Id.* at PageID #19. He was then sent by ambulance to Conroe Regional Medical Center where he was diagnosed with blockages to the left and right arteries to his heart and was treated surgically, including the implantation of stents in his arteries, though he alleges that there is still one blocked artery. *Id.*

Plaintiff substantially testified to the same effect as the allegations of his complaint during the *Spears* hearing on May 17, 2012.

Based on these allegations, Plaintiff is suing Defendants Brouwer, Francis and Maciel for deliberate indifference to his medical needs. Specifically, he alleges Defendant Brouwer ignored his complaints of chest pain on August 1, 2011, and therefore denied him medical treatment; he alleges Defendant Francis misdiagnosed his condition on August 6, 2011, and failed to properly perform an electrocardiogram, thereby denying him medical treatment; and that Defendant Maciel failed to properly treat him twice on August 7, 2011. He cites his causes of action as "medical malpractice and negligence and denial of medical treatment." Complaint at PageID #5. He seeks $25,000 in compensatory damages against each Defendant, jointly and severally; $25,000,000 in punitive damages against each Defendant; $25,000,000 for "physical impairment in the future"; $18,000,000 for mental anguish; and attorneys' fees. Complaint at PageID #22.

Following the *Spears* hearing, the Court issued an Order to Answer and Scheduling Order

on May 17, 2012, setting the schedule for Defendants' answer and summary judgment motions, if any. Defendants answered the complaint on June 25, 2012, and timely filed a Motion for Summary Judgment ("MSJ") (docket entry #48) on October 3, 2012. On October 5, 2012, Defendants also filed a Motion for Leave to File a Supplemental Motion for Summary Judgment (docket entry #49), followed by their Supplemental MSJ, which they filed under seal on October 17, 2012. Plaintiff filed an Opposition to the extension of time for filing the Supplemental MSJ on October 19, 2012 (*see* docket entry #54), but his opposition was primarily on the grounds that he had not yet received the original MSJ and argued that Defendants were untimely. That is incorrect; Defendants timely filed their original MSJ on October 3, 2012, and then sought to supplement it out-of-time. On December 27, 2012, Plaintiff filed a Motion for an extension of time to file responses to the MSJs. *See* docket entry #65. Plaintiff then filed a Response to the Defendants' MSJ (docket entry #60) and a Response to Defendants' Supplemental MSJ (docket entry #61), both on January 3, 2013. The Court has examined the MSJ and Supplemental MSJ and finds little to differentiate them except greater detail in the Supplemental MSJ, which has an expanded set of exhibits, mostly unused beyond what was already filed with the original MSJ. Otherwise, the arguments and evidence offered are the same. Similarly, Plaintiff's two Responses are similar, and both cite to the same Plaintiff's exhibits. The Court will allow the filings of both the MSJ and the Supplemental MSJ and both of Plaintiff's responses thereto. The majority of the Court's review will focus on the expanded arguments as cited in the Supplemental MSJ and Plaintiff's expanded Response and exhibits thereto.

## II.     STANDARD ON SUMMARY JUDGMENT

Rule 56(a), Fed. R. Civ. P., provides that the Court may only grant a motion for summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." *First American Title Ins. Co. v. Continental Cas. Co.*, - - - F.3d - - - -, 2013 WL 757655, at *2 (5th Cir. Feb. 28, 2013) (quoting Fed.R.Civ.P. 56(a)); *VRV Development L.P. v. Mid-Continent Cas. Co.*, 630 F.3d 451, 455 (5th Cir. 2011) (same). The party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). The moving party, however, "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant's burden is only to point out the absence of evidence supporting the nonmoving party's case. *Stults v. Conco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996). Once the moving party makes a properly supported motion for summary judgment, the nonmoving party must look beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial. *Id*. Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the nonmovant's burden. *Id*.

Summary judgment is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions. *Honore v. Douglas*, 833 F.2d 565 (5th Cir. 1987). The district court must look to the full record, including the pleadings, affidavits, and depositions. *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Under this standard, fact questions are considered with deference to the nonmovant. *Reid v. State Farm Mutual Automobile Insurance Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby*, 477 U.S. 242,

255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986). The court resolves factual controversies for purposes of summary judgment in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *Little*, 37 F.3d at 1075. The court does not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. *Wallace v. Texas Tech University*, 80 F.3d 1042, 1048 (5th Cir. 1996) (citing *Little*, 37 F.3d at 1075).

"The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. An issue is "genuine" if the evidence supporting its resolution in favor of the party opposing summary judgment, together with any inference in such party's favor that the evidence allows, would be sufficient to support a verdict in favor of the party. *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987). A "material fact" is one that might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. "When the moving party has carried its burden under Rule 56(c),[5] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (footnote omitted).

Furthermore, in that this is a civil rights claim pursuant to 42 U.S.C. § 1983, "To invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lemons v.*

---

[5]     The predecessor to the current Rule 56(a).

*Swann*, 412 Fed. Appx. 672, 673 (5th Cir. 2011) (per curiam) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477, 110 S. Ct. 1249, 108 L. Ed. 2d 400 (1990)).

## III.    DISCUSSION AND ANALYSIS

As noted above, Defendants' Supplemental MSJ is essentially an expanded version of their original MSJ with expanded evidentiary exhibits.  The Court will therefore primarily address and cite the Supplemental MSJ, as well as Plaintiff's Supplemental Response and his exhibits, which are common between both of his Responses.

Defendants' arguments are that they are immune from lawsuit for actions in their official capacities by the Eleventh Amendment; they are immune from lawsuit in their individual capacities by the doctrine of qualified immunity; and there is no genuine dispute of material fact that Defendants were not deliberately indifferent to Plaintiff's medical needs.

### A.    Eleventh Amendment Immunity

Defendants first assume that they are being sued in both their individual and official capacities.  *See* Supplemental MSJ at 12.  Although it does not appear that Plaintiff differentiated between the two capacities in his complaint, he did later state in his Supplemental Response that "[h]e is suing each defendant in both their Individual and Offic[i]al Capacities."  Supplemental Response at 2 (PageID #1049).  In any event, Defendants assert that any claims against them in their official capacities are barred by Eleventh Amendment Immunity.  *See* Supplemental MSJ at 12, citing *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984); *Neuwirth v. Louisiana State Bd. of Dentistry*, 845 F.2d 553, 555 (5th Cir. 1988).

The Eleventh Amendment bars claims against a state brought pursuant to 42 U.S.C. § 1983. *Aguilar v. Texas Dept. of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998).  In *Will v. Michigan*

*Department of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989), the Supreme Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." The Supreme Court therefore upheld the dismissal of the Michigan Department of State Police and its Director sued in his official capacity. *Id*. The Fifth Circuit has accordingly "held that the Eleventh Amendment bars recovering § 1983 money damages from TDCJ officers in their official capacity." *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002). To the extent that Plaintiff is suing the Defendants in this case for money damages, *see* Complaint at PageID #22, he may not recover on the basis of Defendants' official capacities.

Summary judgment will be granted Defendants on the issue of Eleventh Amendment immunity in their official capacities only.

### B. Deliberate Indifference Claims

Plaintiff raises deliberate indifference to medical needs claims against all three Defendants, though in somewhat different details. The Court will first examine the claims in turn.

To state a claim under the Eighth Amendment for denial of medical care, a Plaintiff must allege acts or omissions "sufficiently harmful to evidence a deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *Norton v. Dimanzana*, 122 F.3d 286, 291 (5th Cir. 1997). "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *Norton*, 122 F.3d at 291. It occurs when two requirements are met. "First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (internal citations and quotations omitted). Second, the prison

official must subjectively know of and disregard a substantial risk to the inmate's health or safety. *Id*. at 839-40.

In this light, deliberate indifference is "an extremely high standard to meet," and requires a showing that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. TDCJ-ID*, 239 F.3d 752, 756 (5th Cir. 2001).

### 1.      Defendant Brouwer

Plaintiff's sole contention as to Defendant Brouwer is that on August 1, 2011, after meeting with her in a sick call on the subject of reordering medications, she ignored his complaint of chest pain and shortness of breath and told him to submit a new I-60 sick call request form on that subject. He alleges he submitted such a new I-60 sick call request that same day, August 1, 2011, complaining of Defendant Brouwer's disregard for his chest pain and shortness of breath, and that she told him to submit a new sick call request. At issue is whether Defendant Brouwer committed an act of deliberate indifference toward Plaintiff's medical needs.

Both Defendant Brouwer and Plaintiff filed affidavits or declarations with the respective Supplemental MSJ and Supplemental Response. Defendant Brouwer attested:

> I met with Mr. Barker on August 1, 2011. The visit was in response to an I-60 sick call request submitted by Mr. Barker complaining that he had not received an order Ibuprofen and Simethicone (Antacid). I examined Mr. Barker. I took his vitals. I observed that Mr. Barker had red peeling skin in his groin area and between his toes. I determined that Mr. Barker had jock itch and athlete's foot. I gave Mr. Barker a tube of toinaftate for his jock itch and athlete's foot. I also rewrote an order for Alamag (Antacid). I did not write an order for Ibuprofen or Simethicone (Antacid). Mr. Barker did not complain of chest pain. I did not tell Mr. Barker to submit another I-60 sick call request for to be seen for chest pain.

> On August 4, 2011, Mr. Barker submitted an I-60 complaining that I had not placed an order of Ibuprofen and Simethicone (Antacid) in the computer system. Mr. Barker did not

complain of chest pain in this I-60 sick call request. He did not claim that I ignored his complaints of chest pain during his visit on August 1, 2011. Further, he did not claim that I told him to submit another I-60 sick call request to be seen for chest pain. On the contrary, Mr. Barker's I-60 sick call request claims I instructed him to submit another I-60 sick call request if he did not receive the order for medication I placed for him.

*See* Supplemental MSJ at Ex. F (Affidavit of Defendant Ruth Brouwer, P.A.) (the "Brouwer Aff."), at Barker 597-98. Plaintiff submitted a document entitled "Affidavit" as Exhibit S to his Supplemental Response, which in fact is an unnotarized but sworn declaration. *See* Supplemental Response at 55-56 (PageID #1109-10) (the "Barker Decl.").[6] In pertinent part, he attests:

> ON OR ABOUT AUGUST 1, 2011, I TALKED TO MID-LEVEL PRACTITIONER, RUTH BROUWER ON THE ISSUES OF REORDERING SOME OF THE MEDICATION AND CREAMS PRESCRIBED FOR ME THAT SHE HAD FAILED TO RE-ORDER. AT THE END OF OUR VISIT P.A. BROUWER STATED "Thats all." I SAID "my chest hurts (holding my hand to my left chest area) & I can't hardly breath." P.A. BROUWER STATED THAT "You didn't put that on the I-60 so I can't see you about that. Put in another I-60." THE AFTERNOON OF AUGUST 1, 2011 I PUT IN ANOTHER I-60 IN THE MEDICAL BOX STATING WHAT P.A. BROUWER HAD TOLD ME & ALSO STATED WITH THE I-60 THAT I WAS HAVING CHEST PAINS & CAN'T HARDLY BREATH.

*See* Barker Decl. at 1 (Supplemental Response at 55/PageID #1109) (spelling, case and punctuation as in original). On the surface, the two sworn statements appear to simply counterbalance each other. However, Plaintiff made certain very specific statements in his declaration, which also appear throughout his complaint and the Supplemental Response. Namely, he contends that he immediately

---

[6] The Court notes that Plaintiff also submitted declarations from several other inmates as witnesses, including Carlos Twerina (Ex. O), Johnny L. Jones (Ex. P), Jamie Martin (Ex. Q), Edwin Williams (Ex. R), Edward L. Martinez (Ex. T) and Sean Ralston (Ex. U). While there is some validity to their attestations of Plaintiff's overall condition during the dates at issue, that condition is not at issue here and none has any personal knowledge of what transpired in the Unit medical department between Plaintiff and any medical service provider. To the extent that they profess to attest to what happened in medical, it is clear that such narrative is based on Plaintiff's own hearsay explanations to them. Therefore, none of the additional declarations provided by Plaintiff has any probative value as to the issue of the Defendants' alleged deliberate indifference to Plaintiff's medical needs during the appointments.

filed another I-60 sick call request and explicitly stated in it the conversation he had with Defendant Brouwer and also stated in it that he was having chest pains and difficulty breathing.

Defendants have submitted copies of Plaintiff's I-60 request forms during the pertinent time. All are submitted under the authenticating affidavit of Custodian of Records Lisa D'Cunha of the University of Texas Medical Branch - Correctional Managed Care, Health Services Archives. *See* Supplemental MSJ Ex. C at Barker 188. The affidavit covers 400 pages of Plaintiff's medical records including, *inter alia*, all scanned sick call requests and medical records beginning June 2011. The only I-60 that refers to the August 1, 2011, appointment with Defendant Brouwer is date-stamped as received on August 4, 2011; the form itself is not dated. *See* Supplemental MSJ Ex. C at Barker 562. There is no I-60 expressly dated August 1, 2011. The August 4 I-60 states in full:

> On the First 8-1-2011 P.A. Brouwer place an order for renewal of medicaion which has not been placed on the computor as the persons passing out the medication states their no reorder for said medication as P.A. Brouwer has stated that its been ordered.
> (1) Simethione 80 mg chew tabs 100s.
> (2) Ibuprofin 60 mgs
> These has not been on the computor as ordered. P.A. Brouwer stated these has been order??????? P.A. Brouwer said to right to medical dept as ask!!

*See* Supplemental MSJ Ex. C at Barker 562. Contrary to Plaintiff's declaration, this I-60 says absolutely nothing about either (1) Plaintiff experiencing chest pains and shortness of breath during the August 1, 2011, appointment or (2) telling Defendant Brouwer about having chest pains or shortness or breath or (3) that Defendant Brouwer told Plaintiff to submit a new I-60 sick call request for another appointment on the issue of chest pains and shortness of breath. The I-60 therefore contradicts Plaintiff's statements regarding Defendant Brouwer and makes his declaration in that regard unreliable.

Plaintiff has also submitted a number of copies of his various I-60 sick call requests. *See*

Supplemental Response at Exs. A-D. Although they refer to a shoulder injury and associated pain Plaintiff experienced previously and requests several times for renewals of medication and creams, none is dated August 1, 2011, and none references any conversation he had with Defendant Brouwer on the issue of chest pain and shortness of breath on August 1, 2011. He did mention having had pain in his chest along with pain in his shoulder and migraines in one I-60 addressed to Dr. Smith, the Unit physician, on July 10, 2010, 13 months prior to the events of which he complains now. *See* Supplemental Response at Ex. D (PageID #1083). That is not relevant to the dates of Plaintiff's complaint.

On the other hand, Plaintiff did not even include the August 4, 2011, I-60 submitted by Defendant Brouwer. Given the completeness of Plaintiff's Supplemental Response and exhibits otherwise, the Court can only conclude that Plaintiff deliberately did not include that I-60 as part of his evidence. Instead, the next-closest I-60 in time he submitted is that of August 6, 2011, which is expressly addressed to Physician's Assistant Kuyinu. *See* Supplemental MSJ at Ex. C (PageID #1082). There, for the first time relevant to this lawsuit, Plaintiff complained of problems breathing, which made his chest hurt in the middle. Again, he states nothing whatsoever about Defendant Brouwer or any conversation he had with her. Not only has Plaintiff failed to substantiate his claim, but the evidence directly contradicts his complaint and his declaration under penalty of perjury.

If the analysis had to rest on the countervailing statements by Plaintiff and Defendant Brouwer, a genuine issue of fact might exist, requiring trial before a fact-finder. In addition, however, Defendant Brouwer also submits the records of Plaintiff's visit to the medical department on August 1, 2011. *See* Supplemental MSJ Ex. C at Barker 563-64. They reflect that Defendant Brouwer prescribed 60 300 mg Alamag tablets, an antacid. *Id*. at Barker 563. It also reflects that

Plaintiff stated he did not receive his medications as prescribed despite being on his medication list. *Id*. at Barker 564. She examined Plaintiff and recorded his vitals, including blood pressure of 133/86 (sitting); weight 160 pounds; height 64 inches; pulse 93 (sitting); respiration 18/minute; and temperature of 98.1 (oral). *Id*. She also found on examination that he had "[r]ed peeling skin in the groin and between the toes and macerated skin between the toes." *Id*. She diagnosed Plaintiff with "[t]inea cruris and tinea pedis," described elsewhere in the summary judgment papers as jock itch and athlete's foot. *Id*. On that diagnosis, Defendant Brouwer gave Plaintiff a "tube of toinaftate in the clinic and told [him] to use it on his feet and groin. Rewrote ALAMAG prescription." *Id*. The record reflects no other complaint by Plaintiff, including no report of chest pains or shortness of breath. There is also no evidence of any requirement for Plaintiff to resubmit a new sick call request.

There is nothing to substantiate Plaintiff's claim that he complained of any chest and breathing problems or that she ignored such claims. To the contrary, the authenticated examination record shows that Plaintiff did not raise the issue during the examination. Even more to the point, the evidence clearly contradicts Plaintiff's sworn testimony that he put his concerns in writing immediately after the appointment and sought another examination on the issue of chest pains and shortness of breath. The I-60 produced by Defendants dated August 4, 2011, irrefutably shows that, despite Plaintiff's sworn statement that he did so, he did not. He has submitted nothing to show otherwise or to demonstrate a genuine issue of fact in that regard.

Furthermore, based on the evidence of the examination on August 1, 2011, there was nothing to indicate to Defendant Brouwer that Plaintiff experienced any unusual chest pains or related symptoms. His blood pressure, pulse, temperature and respiratory rate were generally in the normal

range. *See* Affidavit of Steven Bowers, M.D.[7] (Supplemental MSJ Ex. E at Barker 593-96) (the "Bowers Aff.") at 2 (based on Defendant Brouwer's examination results, "Mr. Barker's vital signs were within normal limits . . . ."). Plaintiff was ambulatory and did not require assistance in arriving for his appointment or leaving for his housing. Furthermore, this is not a case in which Plaintiff had a known history of a heart condition or had suffered previous heart attacks. *See Easter v. Powell*, 467 F.3d 549, 463-64 (5th Cir. 2006) (prisoner stated claim for deliberate indifference against prison nurse who ignored his complaints of chest pain and directed him back to his housing untreated and without medication when (1) she knew prisoner had history of a heart condition; (3) she knew prisoner was suffering severe chest pains; and (3) prisoner did not have his prescribed heart medication). Here, there is no medical history of any known heart condition,[8] and Plaintiff alleges none. In his Supplemental Response, he does offer a single I-60 addressed to non-defendant Dr. Smith in which he complained of "pain in the middle of my chest - to the leftside of my chest to the back of my chest, and the migrain headaces that I'm getting from my chest pain and the pain in my right shoulder." Supplemental Response at Ex. D (PageID #1083) (as in original). That single I-60 was date-stamped July 16, 2010, over a year prior to the August 1, 2011, appointment with Defendant Brouwer. There is nothing in his medical record showing any diagnosis of heart-related problems; he was not on medication for a specific heart condition[9]; and his prior medical history

---

[7]     Dr. Bowers is a reviewing physician and the Legal Coordinator for the University of Texas Medical Branch Correctional Managed Care. *See* Bowers Aff. at 1. Defendants submit his affidavit as part of their competent summary judgment evidence.

[8]     Plaintiff himself reported no history of similar problems during another examination. *See* Supplemental MSJ Ex. C at Barker 549.

[9]     Although Plaintiff's medications included two for high blood pressure, Norvasc and Inderal (*see* http://www.pdrhealth.com/drugs/norvasc and http://www.pdrhealth.com/drugs/inderal

documents at some length his shoulder problems and the upper body limitations and pain associated with it. Even if Plaintiff had complained of chest pains to Defendant Brouwer on the day of his appointment, there is no medical history or any preexisting prescription for medication (and no results of the examination she carried out that day) to alert Defendant Brouwer to any heart condition. Therefore, the situation is distinguishable from *Easter*, *supra*. Defendant Brouwer provided Plaintiff with treatment for the problems as presented, including as a result of her examination of him.

There is no basis for a claim of deliberate indifference against Defendant Brouwer and Plaintiff has shown nothing to create a genuine dispute as to any material fact, Fed. R. Civ. P. 56(a), in the face of Defendant Brouwer's competent summary judgment evidence, and she is entitled to a grant os summary judgment in her favor.

## 2. Defendant Francis

Here, Plaintiff alleges that on August 6, 2011, Defendant Nurse Joyce Francis was deliberately indifferent to his medical needs. Plaintiff filed an I-60 sick call request on that date, which he addressed to Physician's Assistant Kuyino. *See* Supplemental MSJ Ex. C at Barker 561. In it, he complained he was having problems breathing, making his chest hurt in the middle with sharp pains at night. *Id*. He went to medical and was seen by Defendant Francis. *Id*. at Barker 553-60 (examination reports). As a result of that appointment, Plaintiff alleges that Defendant Francis simply did not believe his story that Defendant Brouwer ignored his complaints, and called him a "liar"; and that she incorrectly hooked up the electrocardiogram machine, obtaining an "incomplet[e]

---

(both last visited March 11, 2013)), the actual blood pressure she took during that appointment was normal.

misreading" of his heart activity. Complaint at PageID #16. He appears to imply in the complaint that Defendant Francis did nothing else. Further, he explicitly stated that Defendant Francis did nothing else in his Supplemental Response:

> ON **AUGUST 6, 2011** (Saterday) NURSE JOYCE FRANCIS & NURSE MELISSA CONARROE CALLED O-LINE WHERE I WAS NOW HOUSED & TOLD THE TANK OFFICER TO HAVE ME, OFFENDER BARKER, COME TO THE INFIRMARY. I PROCEEDED TO THE INFIRMARY AS BEST I COULD. EACH STEP HURT SO BAD. MY HEART FELT SO MUCH PAIN & THE BREATH THAT I TOOK WAS LIKE ICE IN MY MOUTH. UPON ARRIVAL AT THE INFIRMARY, NURSE FRANCIS ESCORTED ME TO THE EXAMINATION ROOM TO DO AN E.K.G. ALL THE WHILE SHE & NURSE CONARROE COMPLAINED TO EACH OTHER ABOUT WHAT NURSE STEPHEN MARTIN & GOERGENE McGINNIS WERE DOING OR NOT DOING IN THEIR JOBS. TO START, THE ADHISIVES ON A LEAD TO THE E.K.G. WOULD NOT STICK PROPERLY. NURSE FRANCIS HAD TO KEEP PUTTING THE LEAD ON THE LEFT SIDE BACK ON. YET, SHE CONTINUED THE E.K.G. EVEN AFTER THE ESCORT TDCJ OFFICER TOLD HER THAT THE LEAD HAD COME OFF AGAIN. NURSE FRANCIS SAID "thats ok, there is nothing wrong with him anyway." THEN NURSE CONARROE STATED "All you offenders (inmates) always complain about your chest hurts, you can't breath, just to come sit in the A.C. Do you now how many times we hear that daily?" NURSE FRANCIS UNHOOKED THE LEADS TO THE E.K.G. & TOLD ME TO GO BACK TO O-LINE. "There's nothin wrong with you." DOING NO OTHER EXAMINATIONS, NOR ASKING ME ANY QUESTIONS. THE TANK OFFICER SEEING ME UPON MY ARRIVAL BACK ON O-LINE, STATED "You don't look good." I TOLD HER I DO NOT FEEL WELL BUT SHE JUST SAID "I'll put you back in your cell."

*See* Barker Decl. at 1 (Supplemental Response at 55/PageID #1109) (spelling, case and punctuation as in original). While the Court would ordinarily first examine the argument of the moving Defendant before looking to the response, in this case, it is important to note that Plaintiff expressly claims that Defendant Francis performed no other examination than the allegedly faulty E.K.G.

Now examining the Supplemental MSJ argument, Defendants have submitted several evidentiary medical records (Supplemental MSJ Ex. C at Barker 553-60) and the Bowers Affidavit (*id*. Ex. E at Barker 593-96) in support of their contention that Defendant Francis was not

deliberately indifferent. Dr. Bowers succinctly summarizes the record of Defendant Francis' efforts:

> On August 6, 2011, a [sick call request] was received from Mr. Barker that indicated he was having problems breathing, chest pain, numbness left side and leg, dizziness, and the feeling like his "chest is tilting up". The SCR shows Mr. Barker was called out and was seen in the Eastham unit infirmary. When the patient arrived in the infirmary at approximately 10:50 am, his vital signs were taken (BP 159/94, pulse - 112, respiration (R) 18, and oxygen saturation level (PaO2 - 98, normal) and two electrocardiograms (EKG or ECG) were performed. The first EKG taken at 11:01 am showed "sinus tachycardia otherwise normal ECG". Sinus tachycardia is a heart rate of more than 100 beats per minute. A second EKG performed at 11:15 am was normal. Mr. Barker claims that LVN Frances [*sic*] failed to perform a proper EKG. Based on the EKG results, a proper EKG reading was procured. The record indicates Mr. Barker described his pain as a sharp, intermittent, radiating pain that started on his left side, midline with nipple and spread to the center of his chest. The patient was noted to have spontaneous eye opening, oriented verbal response and obeyed commands. A physical examination showed an irregular apical pulse, shallow respirations, that he was alert and oriented time three, normal strength in both arms and legs, peripheral pulses in all extremities, his lungs were clear, pupils were equal and reactive, and normal capillary refill. LVN Frances [*sic*] contacted PA Kuyinu who gave orders for a Kenalog (steroid) 80mg injection. The patient's vital signs were taken again at 12:30pm and 1:20pm and were within normal range. based on verbal orders of PA Kuyinu, LVN Frances [*sic*] released the patient to security with instructions to contact medical with any further complaints.

*See* Bowers Aff. at 2 (summarizing contents of Ex. C. at Barker 553-60). Dr. Bowers' summary is accurate. Specifically, instead of improperly operating the electrocardiogram machine, Defendant Francis obtained two different EKGs of Plaintiff at two different times, *see* Supplemental MSJ Ex. C at 553 (11:01am), 554 (11:17am), which Dr. Bowers certified as "proper EKG[s]" and "successful EKGs." Bowers Aff. at 2 and 3. Moreover, instead of simply telling Plaintiff that there was nothing wrong with him and sending him back to his housing, Defendant Francis examined Plaintiff and recorded his vitals, Ex. C at Barker 555; in fact, she did so several times. *See* Ex. C at Barker 558 (examination log) and 559 (showing examination results for temperature, blood pressure, pulse, respiration, and blood oxygenation at 10:50am, 12:00 noon; 12:30pm and 1:20pm). Defendant Francis consulted with Physician's Assistant Kuyinu and, on his orders, administered 80mg of

Kenalog at 11:45am. *Id.* As a licensed vocational nurse, Defendant Francis cannot perform medical diagnoses or prescribe medication or therapeutic or corrective measures. Bowers Aff. at 3-4. Finally, on PA Kuyinu's orders allowing his release, Plaintiff left the clinic at 1:35pm with "no further complaints at this time." *Id.* at 558.

Clearly, Defendant Francis performed her duties adequately and under the supervision of PA Kuyinu. Equally clearly, Plaintiff's allegations are incorrect, if not blatantly false. There is no basis for a claim of deliberate indifference to Plaintiff's medical needs in this case. Defendant Francis is entitled to summary judgment in her favor.

### 3. Defendant Maciel

Finally, Plaintiff alleges that Defendant Nurse Maciel was also deliberately indifferent to his medical needs in the course of two visits on August 7, 2011. On the first visit, that morning, Plaintiff alleges that Defendant Maciel simply asked him what was wrong and, on hearing of his chest pains, "diagnosed Plaintiff as having done to much exersies." *See* Complaint at PageID #17 (as in original). He further alleges that Defendant Maciel did not take any vitals - including specifically his temperature, blood pressure or an EKG - but "prescribed" 600mg Ibuprofen and sent him back to his housing area. *Id.* That afternoon, Plaintiff alleges, guards on the run called medical on Plaintiff's continued complaints of chest pain and he was met by Defendant Maciel with a wheelchair. *Id.* at PageID #17-18. He further alleges Defendant Maciel escorted him back to medical, where Defendant Maciel "prescribed" administration of a liter of lactated ringer's solution, "which enhanced Plaintiffs Barkers sever pain," and "bismith-saliclate tabs." *Id.* at PageID #18 (as in original). After that, Plaintiff alleges, Defendant Maciel told him return to his housing and to return the next day if Plaintiff wanted. *Id.*

Similarly, in his affidavit response to the Supplemental MSJ, Plaintiff contends:

ON SUNDAY, **AUGUST 7, 2011,** THE O-LINE TANK OFFICER **SANDRA JONES**, ON THE A.M. SHIFT, AFTER HEARING MY COMPLAINT THAT I COULD NOT BREATH RIGHT & MY CHEST HURT, HAD THE PICKET BOSS CALL THE INFIRMARY & WAS INSTRUCTED TO HAVE ME WALK (well over 300 paces) TO THE INFIRMARY IF I WANTED TO BE SEEN. AS I WALKED THE PAIN IN MY CHEST HURT SO BAD THAT IT FELT LIKE SOMEONE PUT A KNIFE THROUGH MY HEART & MY BREATH WAS SO COLD AS I TOOK A SMALL INTAKE AS IT HURT EACH & EVERY STEP I TOOK. WHEN I ARRIVED IN THE INFIRMARY, **R.N. THOMAS MACIEL** ASKED "Whats wrong with you?" I TOLD HIM "my chest hurts & I can hardly breath." NURSE MACIEL THEN SAID" You must have done to much exercising & you strained your chest muscles"[.] I THEN TOLD HIM "I'VE NOT DONE ANY EXERCISES & CAN'T DO ANY DUE TO INJURIES & MY RESTRICTIONS SHOW THAT I AM NOT TO (1) BEND AT THE WAIST, (2) NO LIFTING OVER 25 lbs. (3) NO CLIMBING. (4) NO REACHING OVER SHOULDERS. (5) BOTTOM BUNK ONLY. . ." WITH NO FURTHER QUESTIONS OR EXAMINATIONS NURSE MACIEL PRESCRIBED 600mg IBEPROFEN & SENT ME BACK TO O-LINE.

IN THE AFTERNOON OF <u>**AUGUST 7, 2011**</u>, DURING THE P.M. SHIFT, O-LINE OFFICERS INFORMED THE INFIRMARY THAT OFFENDER BARKER WAS HAVING CHEST PAINS, TROUBLE BREATHING & WAS NOW THROWING UP. **SGT. ANDERSON**, HAVING BEEN NOTIFIED AT THE SEARCHERS DESK, CAME TO MY CELL, ESCORTED ME FROM MY CELL ON TWO ROW TO THE BOTTOM OF THE STAIRS WHERE R.N. MACIEL WAS WAITING WITH A WHEEL CHAIR STATED ONLY "You again!" & WITHOUT CHECKING ME OR ASKING ANY QUESTIONS ROLLED ME DOWN TO THE INFIRMARY. UPON ARRIVAL IN THE INFIRMARY R.N. MACIEL ASKED "So, whats wrong with you now?" I TOLD HIM AGAIN OF MY CHEST PAINS & DIFFICULTY BREATHING & HOW IT HURT TO DO SO. HE TOLD ME TO GET ON THE EXAME TABLE THEN SAID "I'm gonna run you an I.V." SO I LAYED THERE FOR TWO HOURS FEELING WORSE & WORSE. HE THEN PRESCRIBED ME "BiSmith-Saliclate Tabs" (Pepto Bismal) THEN SENT ME BACK TO O-LINE.

*See* Barker Decl. at 2 (Supplemental Response at 56/PageID #1110) (spelling, case and punctuation as in original).

As in the other Defendants' cases, Defendants have submitted a number of medical records as part of their summary judgment evidence. *See* Supplemental MSJ Ex. C at Barker 540-52. Contrary to Plaintiff's allegations of no examination having been performed, Defendant Maciel

examined him and recorded his vitals during both the morning and afternoon visits.  *See* Ex. C at

Barker 547 (a.m.) and 540 (p.m.).

During the morning visit, Defendant Maciel recorded Plaintiff as a walk-in whose chief

complaint was with discomfort of the chest wall.  *Id*. at Barker 548.  Plaintiff complained he had had

the problem for "over a month now," that it comes and goes and that it hurts to breathe or move.  *Id*.

He characterized the pain as 8 on a scale of 10.  *Id*.  However, its frequency was intermittent and it

was not a radiating pain.  *Id*. at Barker 549.  Plaintiff reported no history of similar problems.  *Id*.

However, he did have a history of arthritis.  *Id*.  Defendant Maciel noted that on examination,

Plaintiff had "reproducible pain with manipulation of chest wall.  Lungs are clear.  Heart regular

rhythm and rate.  Pulse ox 98%.  No outward signs of trauma to chest wall.  P[atient] does report

having problems with his [right] shoulder, which is long standing."  *Id*.  He had joint stiffness, but

a full range of motion in all extremities except his bilateral upper extremities, which was limited.

*Id*.  His peripheral pulses were all noted as present.  *Id*. at Barker 550.  There were no signs of edema

at any extremity.  *Id*.  On the orders of Dr. Smith, Plaintiff was given a 30-day supply of 600 mg of

Motrin and told to follow up in one week.  *id*. at Barker 551.  He was then released to security.  *Id*.

at Barker 552.

During the afternoon visit, Defendant Maciel recorded Plaintiff's chief complaint as having

"called to O line [patient] reportedly throwing up, states took some of the ibuprofen from earlier and

was feeling fair."  *Id*. at Barker 541 (amended from all capitals).  He reported his pain at 4 out of 10

at that time.  *Id*.  He again reported his pain as intermittent and not radiating.  *Id*. at Barker 542.  He

experienced nausea, and "threw up after eating."  *Id*.  There was no bleeding involved.  *Id*.  His

weight was unchanged, he had normal appearance and warm skin, his skin turgor was normal, his

abdomen flat and soft, bowel sounds normal in all quadrants. *Id*. at Barker 542-43. On the orders

of Physician's Assistant Kuyinu, Defendant Maciel administered a liter of lactated ringer's solution,

after which Plaintiff was released back to security in stable condition. *Id*. at Barker 543-44.

Defendant Maciel substantiated these records in his own affidavit. *See* Supplemental MSJ

Ex. G, at Barker 609-10. He confirmed that on arrival in the morning, Plaintiff's vital signs were

normal and Defendant Maciel was able to reproduce his chest pain through manipulation of the chest

wall. *Id*. at Barker 609. For those reasons, he did not administer an EKG. *Id*. He reported his

examination results to Dr. Smith, who also did not order an EKG. It was Dr. Smith who prescribed

Motrin twice daily for 30 days and scheduled a follow up appointment a week later. *Id*. Defendant

Maciel affirmed that he neither diagnoses conditions nor prescribes medication, but complied with

Dr. Smith's orders. *Id*. Defendant Maciel also attested that Plaintiff returned that afternoon,

complaining that the Motrin had made him vomit, but that it had helped with his pain, which had

decreased to a 4 out of 10. *Id*. at Barker 610. Again, Defendant Maciel reported his findings to

Physician's Assistant Kuyinu, who ordered one liter of lactated ringer's for intravenous

administration, a liquid diet for 24 hours and to avoid dairy products for 48 hours. *Id*. Plaintiff was

instructed to return or notify a nurse if his symptoms worsened. *Id*. Defendant Maciel attested he

complied with all of Physician Assistant Kuyinu's orders. *Id*.

Contrary to Plaintiff's allegations, it is clear from the competent summary judgment evidence

that Defendant Maciel did not make any diagnoses or prescribe any medications or other courses of

treatment. As a registered nurse, he was not able to do either, but instead reported his findings to

competent medical supervisors - either Dr. Smith, an M.D., or Physician's Assistant Kuinyu - who

did have authority to both diagnose and to prescribe. The treatment records are equally clear that

Defendant Maciel did not disregard Plaintiff's medical care. In the morning session, he followed an examination regimen oriented toward musculoskeletal symptoms, consistent with the pain and symptomatology presented by Plaintiff. *See id*. at Barker 547. In the afternoon session, he followed an examination regimen oriented toward abdominal pain, again consistent with the symptoms and subjective reports presented by Plaintiff. *See id*. at Barker 540. In *each* case, Defendant Nurse Maciel reported the results of his examination to competent medical authority and carried out the orders given him in response, as discussed above. As reviewing medical doctor Dr. Bowers states in his affidavit:

> It is my expert opinion that RN Maciel performed a proper examination, followed nursing protocol by notifying a provider of his examination findings, and carrying out the orders given by the provider. RNs are not allowed to diagnosis [*sic*] or give orders for medical treatment.

Bowers Affidavit at 4. There is no basis for a claim of deliberate indifference to Plaintiff's medical needs by Defendant Maciel. He is entitled to summary judgment in his favor.

Plaintiff has not established a genuine dispute as to Defendants' argument regarding either Defendant Brouwer, Francis or Maciel, nor does his own summary judgment evidence support a finding in his favor in light of the Defendants' evidence. Therefore, Defendants are entitled to summary judgment on the issue of deliberate indifference to Plaintiff's medical needs.

### C.     Qualified Immunity

Defendants finally assert that they are entitled to qualified immunity from Plaintiff's claims. The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct.

2727, 73 L. Ed. 2d 396 (1982); *Wilson v. Layne*, 526 U.S. 603, 614, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999). The doctrine of qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire v. Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992), *citing Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). The Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). The Supreme Court held that courts are initially required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Id*. at 201. Second, if the Plaintiff has satisfied the first step, the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id*. With respect to the second step, the Fifth Circuit has held that "a state actor is entitled to qualified immunity if his or her conduct was objectively reasonable in light of the legal rules that were clearly established at the time of his or her actions." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002), *cert. denied*, 537 U.S. 1232, 123 S. Ct. 1355, 155 L. Ed. 2d 196 (2003).

The Supreme Court more recently revisited *Saucier v. Katz* in *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). The Court held that "experience supports our present determination that a mandatory, two-step rule for resolving all qualified immunity claims should not be retained." *Id*. at 234. The Court went on to hold that "while the sequence set forth in [*Saucier*] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which

of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. The Supreme Court noted that the *Saucier* procedure sometimes unnecessarily "results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case." *Id*. at 236-37. It was further noted that courts are free to follow the *Saucier* procedure, but the decision "simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases." *Id*. at 242. The Supreme Court went on to discuss the facts of the case and found that the defendants were entitled to qualified immunity because the officers' conduct did not violate clearly established law. *Id*. at 244.

Here, there is no question whether Plaintiff's right to be free from deliberate indifference to his medical needs existed at the time of the medical appointments between August 1 - 7, 2011. In whichever order the *Saucier* factors are considered, that point is clear.

The operational issue is whether Defendants' "actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire*, 957 F.2d at 1273. Put another way, "do the facts alleged show the officer's conduct violated a constitutional right[?]" *Saucier*, 533 U.S. at 201. As discussed above, however, Plaintiff has not shown an Eighth Amendment violation for deliberate indifference. Therefore, this prong of *Saucier* mandates a finding of qualified immunity on Defendants' parts.

It is accordingly

**ORDERED** that Defendants' Motion for Leave to File a Supplemental Motion for Summary Judgment (docket entry #49) is hereby **GRANTED**. It is further

**ORDERED** that Plaintiff's Pro Se Motion for Leave to File Response and Objection to the

Defendants' Motion for Exten[s]ion of Time to File for Supplemental Summary Judgment (docket entry #54); "Pro Se Motion for Leave to File for Disclosure to Defendant Motions for Summary Judgment" (docket entry #65), construed as a Motion for Extension of Time to File Responses to Defendants' Motion for Summary Judgment and Supplemental Motion for Summary Judgment; and Plaintiff's Pro Se Motion for Leave to File for Page Limitations to be Expanded Due to Exhibits being Added (docket entry #67), are hereby **GRANTED**.  It is further

ORDERED that, having considered Plaintiff's Response and Objection thereto, Defendants' Motion for Leave to File a Supplemental Motion for Summary Judgment (docket entry #49) is hereby **GRANTED**.  It is further

ORDERED that Defendants' Motion and Supplemental Motion for Summary Judgment (docket entries #48 and 50) are hereby **GRANTED**.  It is further

ORDERED that Plaintiff's complaint is hereby **DISMISSED WITH PREJUDICE**. Plaintiff shall take nothing as a result of this lawsuit.  It is further

ORDERED that the parties are to bear their own costs and fees.  It is finally

ORDERED that any motion not previously or otherwise ruled on herein is hereby **DENIED**.

So **ORDERED** and **SIGNED** this **14** day of **March, 2013.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE

26